UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  09-20736-CR-MOORE/SIMONTON

UNITED STATES OF AMERICA,

       Plaintiff,

v.

JOSEPH L. BELLAMY,

       Defendant.

                    /

## REPORT AND RECOMMENDATION

Presently pending before this Court is Defendant's Motion To Suppress Statements and Objects (DE # 23).  The Honorable K. Michael Moore, United States District Judge, has referred this matter to the undersigned United States Magistrate Judge (DE # 21).  The government has responded in opposition (DE ## 26, 27).  Defendant has replied (DE # 31).  An evidentiary hearing on the motion was held on October 13 and 14, 2009.  For the reasons stated below, the undersigned Magistrate Judge **RECOMMENDS** that the motion be **DENIED**.

## I. BACKGROUND

Defendant is charged in a one-count Indictment with unlawful possession of a firearm and ammunition after having been convicted of a felony, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e) (DE # 7).

The firearm which forms the basis for this charge is a Ruger Model P85, 9mm handgun that was found locked in the toolbox of Defendant's white, Ford F-150 truck at the time he was stopped by Miami-Dade Police Detective Azrak and Miami-Dade Police Officer Ruperto Peart.  In addition, 17 rounds of 9mm PMC Luger ammunition were

seized.  Following his arrest, Defendant was taken to a police station where he waived his *Miranda* rights both orally and in writing, and made both a written statement and an oral statement (Government Exhibits [hereafter GX] 5, 6).

   II.  <u>THE MOTION TO SUPPRESS</u>

   In his Motion to Suppress Statement and Objects, Defendant challenges the validity of the traffic stop of his pickup truck, which resulted in the seizure of the firearm at issue from the locked toolbox in the bed of the truck.  He contends that the stop was not based on either probable cause or reasonable suspicion of criminal activity, and that the ensuing search of the toolbox was not based on either consent or probable cause to believe that it contained evidence of a crime.  He also contends that any statements he made following his arrest must be suppressed as fruit of this unlawful stop.  At the hearing, Defendant clarified that he is not independently challenging the admissibility of the statements; his only challenge to the statements derives from the allegedly unlawful stop and search.

   Initially, Defendant challenges the factual basis offered by the Government to support the stop and search, *i.e.* that Defendant was observed meeting with a seller of narcotics and giving the seller currency before they walked out of view; and, then after Defendant returned to his truck, he was observed removing a gun from his waistband and placing it in the tool box of his truck.  Defendant contends that the testimony is not credible and that he did not meet with the narcotics seller; and, that although he removed a gun from the passenger compartment of his truck and put it in the locked toolbox in the bed of the pickup truck, he never carried it in his waistband; and, the facts do not establish even  reasonable suspicion that his actions violated weapons or narctoics laws.  In support thereof, Defendant relies on 1) the testimony of his witness,

2

Latasha Eve, that at the time of the officer's alleged observations, she saw Defendant go directly from her apartment to his truck[1]; 2) Defendant's written and oral post-arrest statements that he left the gun in his truck when he went to Eve's apartment, and removed it from the passenger compartment of the truck and placed it in a securely locked inaccessible toolbox before he drove away; and 3) the fact that the recordings of the police radio transmissions did not indicate that the officers saw Defendant meet with the narcotics seller (DE # 31 at 3-8).

Defendant further contends that, even assuming that he had a weapon concealed in his waistband, the police had no way to know whether he had a concealed weapons permit, and thus this observation would not provide reasonable suspicion to support the stop. In addition, the fact that a gun was removed from the passenger compartment of

---

[1] Latasha Eve testified that she lives at 1906 N.W. 62nd Street, and that Defendant is the father of her nine-year-old daughter. She testified that on the day Defendant was arrested, Defendant arrived at Eve's apartment at about 6:00 or 6:15 pm. She thought that Defendant arrived at that time because Defendant always gets off work at 5:30 p.m. She stated that she was having a difficult pregnancy and was in her bed when Defendant arrived to visit their daughter. She did not see Defendant or speak to him when he was in her apartment. When her daughter came upstairs to tell her that Defendant was at the door, she told her daughter she could let Defendant in and to say hi for her. She had not heard Defendant knock at the door. Defendant usually stayed about an hour, or an hour and 15 minutes when he came to visit his daughter. She heard the back door close when Defendant left her apartment, and she saw Defendant walking out to his car, which was in the parking lot facing her back door. She watched him walk straight to his truck and get inside, and then she turned away and laid back down. The driver's door was on the far side of the truck. She saw him get into the truck and close the door, and then laid back down in bed. She did not see him with a gun in her apartment; and did not see him put a firearm or anything like that in the back of the truck before he entered. She did not see the police arrest Defendant. She later learned that Defendant had been arrested when the police knocked on the door and brought her the keys to the Defendant's truck. Ms. Eve also testified that she knew Defendant had committed a murder and was a convicted felon. Ms. Eve acknowledged that Defendant pays her child support, which she relies on, and does not want to lose. She knew that if Defendant went to jail, she would lose the child support money. Finally, Ms. Eve testified that she knew drugs were frequently sold in the apartment complex where she lived.

the truck did not establish reasonable suspicion of criminal activity because the police did not know how or where the firearm was located within the truck; and, thus they did not have a basis for concluding that the firearm had been illegally carried inside the truck.  (DE # 31 at 8-10).

Defendant also challenges the validity of the search of the tool box, which occurred after the police noticed the tool box was locked and Defendant gave the police the keys to open the tool box.  Defendant contends that this search was not based on consent, and assuming arguendo that the stop was supported by reasonable suspicion, the search of the locked toolbox exceeded the bounds of a search permitted in connection with such a stop.  Finally, Defendant contends that Officer Peart's request for and receipt of Defendant's identification violated the Fourth Amendment because it was done to discover evidence of a crime, which is not the purpose of a stop based upon reasonable suspicion (DE # 31 at 10-13).  Defendant does not challenge either his oral and written waiver of his *Miranda* rights after his arrest, or his oral and written statements made after he waived his rights, except as fruit of the unlawful stop and search (DE # 23 at 3-4).

In its initial response, the government contends that the stop of Defendant's truck was lawful based upon the officers' reasonable suspicion that Defendant had engaged in a hand-to-hand narcotics sale; and that the subsequent search of the toolbox was based upon Defendant's consent (DE # 26).  Following the testimony of its witnesses, the Government expanded its contentions, and filed a supplemental response in which it argued that the stop was based upon probable cause to believe that Defendant had violated either the law against carrying a concealed weapon or the law against openly carrying a firearm; and, thus there was probable cause to support a warrantless search

the truck for evidence of this offense.

### III. <u>FINDINGS OF FACT</u>

At the evidentiary hearing, the government presented the testimony of Miami-Dade Police Detectives John Saavedra, Jason Gambill and Scott Ogden, and Miami-Dade Police Officer Ruperto Peart.  In addition, the Court admitted into evidence government exhibits one through six, which consisted of:  an aerial photograph of the PSU apartments, located in the area of NW 62nd Street and 20th Avenue, Miami, Florida (GX 1); an audio recording of the August 19, 2009 narcotic stakeout beginning at 7:15 p.m. and ending at approximately 8:30 p.m. (GX 2); a photograph of the side view of Defendant's white truck (GX 3); a photograph of the tool box on Defendant's white truck (GX 4); the Advice and Waiver of Rights Form signed by Defendant (GX 5); and Defendant's written statement (GX 6).  The defense relied upon the testimony of Latasha Eve, and of Miami-Dade Police Detective Eric J. Mourino.  In addition, the Court admitted into evidence Defense Exhibit A, an audio recording of the August 19, 2009 narcotics stakeout beginning at 6:00 p.m. and ending at approximately 7:15 p.m.

Based upon the totality of the evidence presented at the hearing, and the demeanor of the witnesses, the undersigned Magistrate Judge finds that the testimony of Detectives John Saavedra, Jason Gambill, Scott Ogden, and Eric J. Mourino, as well as Officer Ruperto Peart was credible.  Their testimony was forthright, internally consistent, and consistent with each other and with the recording made of police communications at the time of the events.  As explained in more detail below, the undersigned finds that the testimony of Ms. Eve does not credibly refute the testimony of the officers regarding their observations of Defendant's actions– Ms. Eve was vague with respect to the timing of events about which she testified; and, it appears that she

did not accurately estimate the time that she claimed Defendant arrived at her apartment, or when he left.  In addition, although the undersigned does not find that Ms. Eve was deliberately untruthful, her relationship with Defendant may have colored her recollection of events in his favor.

Based upon the testimony, and the exhibits introduced at the hearing, the undersigned makes the following findings of fact:

1.  Detective John Saavedra has been employed by the Miami-Dade Police Department for approximately seven years.  Detective Eric Mourino has been employed by the Miami-Dade Police Department for approximately eight and one-half years.  On August 19, 2009, Detectives Saavedra and Mourino were assigned to the Tactical Narcotics Team (TNT) surveillance squad.  The surveillance squad consisted of four undercover officers paired up into two teams in unmarked cars.  The teams would locate illegal narcotics activity and notify other detectives, the takedown units, who would arrest the purchasers and the sellers.

On August 19, 2009, at approximately 6:59 p.m., Detectives Saavedra and Mourino began a surveillance in an unmarked car in the west side of the parking lot of the PSU apartment complex, located in the area of N.W. 62nd Street and N.W. 20th Avenue in Miami, Florida.  As depicted in GX 1, this complex has a central area for parking which is surrounded by separate apartment buildings on all sides.  Detective Saavedra was in the back seat and Detective Mourino was in the driver's seat.   Detectives Saavedra and Mourino were in radio communication with the takedown units, who waited nearby, also in unmarked cars.[2]  The takedown officers were in plainclothes, but wore vests which

---

[2] The radio communications beginning at 7:15 p.m. are contained on GX2.  The radio communications before that time are contained on Defense Exhibit ("DX") A.

6

said "police".

2.  After about one minute following their arrival at the PSU apartment complex, Detective Saavedra identified a narcotics seller and witnessed the first transaction, initiated by a buyer who walked up to the seller.  Detective Saavedra saw the buyer give currency to the seller, who then gave the buyer a baggie, which the seller took from a Ziploc bag, which contained multiple baggies.  The  seller was standing by a meter room outside the apartment building on the south side of the complex.  Detective Saavedra's car was parked approximately 25 yards away from the seller.  Detective Saavedra had a clear unobstructed view of the seller, and was also using binoculars.  Detective Saavedra used his police radio to advise the takedown squad that the buyer was leaving. He gave the takedown squad a description of the buyer and a direction of travel and requested that the buyer be stopped.  The first buyer was not stopped because he remained in the area and the team felt that arresting the buyer near the area of the seller would result in the seller being informed of the police presence, which would compromise the operation.

3.  In the next few minutes, Detective Saavedra saw another buyer walk up to the seller and after the exchange was made, the buyer walked away.  Detective Saavedra then used his police radio to advise the takedown squad that the buyer was leaving and requested that he be stopped.

4.  At approximately 7:08 p.m., Detective Saavedra saw a two-door brown Mitsubishi pull into the complex through the entrance to the parking lot.  The Mitsubishi parked in a parking spot in the northeast corner of the parking lot.  The driver of the Mitsubishi left the car and walked to the seller, gave currency to the seller, and received a baggie in return.  The seller walked behind the buyer as the buyer returned to the

7

Mitsubishi.  After the buyer entered the Mitsubishi on the driver's side, the seller went to the passenger side, looked inside, said something, and gave the driver something that Detective Saavedra couldn't identify.  The seller then returned to his original position. The Mitsubishi left and went northbound on 20th Avenue.  From about 7:13 p.m. to 7:14 p.m., Detective Saavedra made a number of radio transmissions notifying the takedown squad that a two-door brown Mitsubishi was turning northbound on 20th Avenue, giving an identification of the driver, and requesting that the Mitsubishi be stopped.[3]

5.  As the Mitsubishi turned north on 20th Avenue, Detective Saavedra saw a white Ford F-150 pickup truck come into the parking lot from 20th Avenue, drive eastbound, and park on the east side of the parking lot, almost directly behind the unmarked car in which Saavedra was located.  The backs of the vehicle were facing each other, and the pickup truck was a little toward Saavedra's right.  The driver of the pickup truck, later identified as Defendant, remained inside his truck.

6.  Meanwhile, at about 7:15 p.m. another vehicle, a gold Nissan Maxima, also entered the parking lot and parked on the north side of the parking lot, roughly next to the space where the Mitsubishi had parked.  The Nissan's driver walked to the seller, gave the seller currency, the seller gave narcotics to the Nissan's driver, and the driver walked back to his car.  At about 7:16 p.m., as the Nissan drove away, Detective Saavedra notified the takedown squad that a Nissan Maxima was turning northbound on 20th Avenue, gave an identification of the driver, and requested that the Nissan be stopped.  During this time, Defendant stayed in the pickup truck.

---

[3] The Mitsubishi was stopped before Defendant's pickup truck was stopped; at about the same time that Defendant's truck was stopped there was a radio transmission indicating that narcotics had been recovered from the driver of the Mitsubishi.

7.  As the Nissan began to go north, a marked Miami-Dade police vehicle pulled in southbound on 20th Avenue and made a U-turn behind the Maxima.  Detective Saavedra thought that the marked unit, which was not part of the takedown squad, had heard Saavedra's message to the takedown squad and was trying to arrest the Nissan's driver. Detective Saavedra got on the radio and advised the takedown unit that he believed that the marked unit might be from the Robbery Intervention Detail (RID).

8.  By the time Detective Saavedra looked back at the white truck, Defendant was already walking towards the seller.  Detective Saavedra saw Defendant give currency to the seller, and then Detective Saavedra saw both Defendant and the seller look west toward 20th Avenue and the entrance of the complex.[4]  Detective Saavedra was looking at their faces through the binoculars and thought that they looked spooked by something which had caught their attention.  Detective Saavedra then heard sirens while he heard Detective Mourino say that marked vehicles were coming into the hole. Detective Saavedra thought that the other marked units were coming to arrest the seller.[5] Detective Saavedra then looked back at Defendant and the seller and saw them walking south on the east side of the building.

9.  Detective Saavedra saw the marked units park on the north side of the parking lot.  By the time Detective Saavedra looked back to see where Defendant was, a minute

---

[4] Detective Mourino testified that he did not advise the other members of the team about the actions of the driver of the white truck because when Defendant got out of the white truck, and handed the seller the currency, the marked and unmarked police vehicles had arrived with lights and sirens on, and the arrival of the marked units distracted Detective Mourino, and he was trying to determine why they were there.

[5] Detective Saavedra later learned that the marked vehicles were responding to a 911 call which reported that there were firearms at that location.

or so later, Defendant was almost in front of his pickup truck.[6]  Detective Saavedra then looked back at the officers who had arrived in the marked units.  After that, he saw Defendant standing in the door frame of the pickup truck with the door open, facing east. Detective Saavedra then saw Defendant: 1) quickly look left, right and left, as if he was looking to see if he was being watched; 2) use his right hand to take a gun from his waistband; 3) open a tool box on the bed of the pickup truck; 4) place the gun inside the tool box; and 5) close and lock the tool box.[7]  Detective Mourino also saw Defendant pull a handgun from his waistband and lock it in the tool box in the bed of his truck. Detective Mourino did not see the gun until Defendant pulled it out of his waistband. Defendant then got into the pickup truck and began to drive away.

10.  From approximately 7:17 p.m to 7:19 p.m., Detective Saavedra made a number of radio transmissions saying that he had seen the driver put a "55", which is the code for a firearm, in the tool box in the back of his pickup.  Detective Saavedra gave a description of the truck, the truck's license tag, a description of the driver, and reported that the truck was going westbound out of the PSU complex on 20th Avenue.  He requested that they stop the pickup truck.  At approximately 7:19 p.m., Officer Ruperto Peart[8] and Detective Azrak stopped the pickup truck by pulling up near the truck in their

---

[6] Detective Saavedra did not see the seller come back, but later saw the seller walking on the east side of the building after the pickup truck was stopped.  Detective Saavedra then gave a radio description of the seller and asked if anyone was around to arrest him.

[7] Detective Saavedra had not focused on Defendant's waistband before Detective Saavedra saw the firearm.

[8] Officer Peart has been employed by the Miami-Dade Police Department for approximately seven years and was assigned to TNT on August 19, 2009.  He and Detective Azrak were in an unmarked vehicle with Officer Peart driving.

unmarked unit, blocking part of the road, exiting their car with their guns drawn, and telling Defendant, "Miami-Dade police. Stop!"  Detective Saavedra confirmed on the radio that Officer Peart and  Detective Azrak were stopping the correct vehicle.

11.    Officer Peart and Detective Azrak approached the driver's side of the pickup truck with their weapons drawn, but pointing down at Defendant.  They were wearing police paraphernalia.  They ordered Defendant to show them his hands. Defendant put his hands in the air.  Detective Azrak ordered Defendant out of the truck, and he left the pickup with his hands up.  Defendant was compliant with the officer.  Detective Azrak holstered her gun, patted down Defendant, and found nothing.  Officer Peart then holstered his gun, went over to the tool box on the truck and tried to open it, but it was locked.  At that time, Defendant spontaneously told Officer Peart that the box was locked, said he had the keys, gave about 30 keys to Officer Peart, and then pointed out the key that unlocked the tool box.[9]  Defendant was not handcuffed at that time.[10]  Officer Peart took the keys, unlocked the tool box, saw a black firearm inside and informed Detective Azrak of that fact.  Detective Azrak then placed Defendant in handcuffs, detaining him during their investigation.  Officer Peart then got rubber gloves from his unit, recovered the firearm, and made it safe.  During this time, Defendant did not say anything.  At about 7:20 p.m., Officer Peart broadcast over the radio that he had located a "55", a gun.  The entire encounter from the time the truck was stopped until the

---

[9] The keys to the truck and the key to the tool box were on different key rings.

[10] The record does not contain any evidence that Defendant did not volunteer his keys to the officers.  The officers' testimony on this point is supported by Defendant's post-arrest oral statement on this issue, which is described *infra.*

recovery of the firearm took approximately a minute.[11]   A review of the radio

transmissions contained in GX 2 confirms this estimated time.

12.   Detective Azrak radioed for a marked unit in which to place Defendant in

while they continued their investigation.   A criminal records check then revealed that

Defendant had a prior felony conviction, and Defendant was arrested for possession of a

firearm by a felon.   Detective Azrak and Officer Peart then contacted Detective Jason

Gambill who, with Detective Scott Ogden, responded to the scene.

13.   Detective Ogden has been with the Miami-Dade Police Department for

approximately 13 years, and Detective Gambill has been with the Miami-Dade Police

Department for approximately 14 years.   They were assigned to the Alcohol, Tobacco,

Firearms and Explosives task force, and they enforced federal firearms violations in

Miami-Dade County.   At the crime scene, Detective Ogden took photographs of

Defendant's truck.   Detectives Ogden and Gambill took custody of the firearm which had

been in Defendant's possession, and directed that Defendant be taken to the Northside

police station.   No one interviewed Defendant as he was transported to the Northside

police station.

14.   Before Defendant was transported, however, Detective Gambill asked

Defendant what he wanted done with his truck.   Defendant said several times that he

wanted to leave it at the crime scene and have the keys given to the mother of his child,

Latasha Eve, who lived in the PSU.   Defendant told Detective Gambill where Ms. Eve

lived, and Gambill took the keys to her.

15.   At the Northside police station, Defendant was placed in an interview room.

───────────────────

[11] Detective Saavedra did not take any part in the arrest.

12

At approximately 9:35 p.m., Detectives Ogden and Gambill introduced themselves to Defendant. They obtained certain biographical information, and then asked if Defendant was willing to speak to them.  They advised Defendant of his *Miranda* rights by reading them from a form.  Detectives Ogden and Gambill showed the form to Defendant, Defendant read the rights aloud to the detectives, and Defendant signed the waiver portion of the form and also orally agreed to waive his *Miranda* rights.  This form was introduced into evidence as GX 5. The form was signed at 9:40 p.m., on August 19, 2009. Detectives Ogden and Gambill signed as witnesses.  Defendant made both a written statement and an oral statement.

16.   The written statement was introduced into evidence as GX 6, and states that Defendant got the gun from his uncle before the uncle died.  Defendant went to the PSU to see his daughter and brought the gun for protection.  He left the gun locked in the truck while he visited his daughter.  When Defendant went back to his truck to go home, he locked the gun in his tool box.  When he pulled out of the parking lot, the police stopped him, got the gun out of the tool box, and arrested him.

17.   Defendant orally told the detectives that he was leaving the PSU after visiting his daughter there, and that when he got in his truck, he took the gun from out of the truck and put it in the tool box.  He told the detectives that when he went to the PSU he brought a gun for protection, as the PSU is a high crime area.  Defendant then said that he had been stopped by the police.  When the police approached his vehicle, one of the officers asked him to step out, and the other officer stepped toward a tool box that was located on the back of his truck in the bed.  When the officer walked towards the rear of the truck by the tool box, Defendant advised the officer that the tool box was locked. Defendant said that he offered to the officer the key that unlocked the tool box, and that

13

he had no problem with the officer going inside the locked tool box.

IV.   **FRAMEWORK FOR ANALYSIS**

 A.   **A Vehicle Stop and Arrest Based Upon Probable Cause**

  It is well-settled that police may stop and search a car, and any containers located therein, without a warrant if there is probable cause to believe that the car contains contraband or evidence of a crime.  *Carroll v. United States*, 267 U.S. 132 (1925); *Chambers v. Maroney*, 399 U.S. 42, 48 (1970); *United States v. Ross*, 456 U.S. 798, 820-821 (1982); *California v. Acevedo*, 500 U.S. 565 (1991); *Pennsylvania v. Labron*, 518 U.S. 938 (1996);.  Similarly, an officer may arrest a suspect in a public place without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense.  *See United States v. Lyons*, 403 F.3d 1248, 1253 (11th Cir. 2005), *citing Michigan v. De Fillippo*, 443 U.S. 31, 36 (1979) (warrantless arrest for misdemeanor disorderly conduct valid where based on probable cause; therefore, ammunition discovered in search incident to arrest was lawfully seized).

  In *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983), the United States Supreme Court held that a determination of probable cause must be based on an evaluation of the totality of the circumstances, and set forth the following guidance:

> Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a "practical, nontechnical conception."  *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id., at 175.  Our observation in *United States v. Cortez*, 449 U.S. 411, 418 (1981), regarding "particularized suspicion," is also applicable to the probable cause standard:
>
> > The process does not deal with hard certainties, but with probabilities. Long before

> the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
>
> As these comments illustrate, probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules.

The Court then provided the following standards to apply when determining the existence of probable cause:

> [T]he term "probable cause," . . . means less than evidence which would justify condemnation. . . . It imports a seizure made under circumstances which warrant suspicion.... Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision.
>
> . . . .
>
> The task . . . is simply to make a practical, common- sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.

462 U.S. at 235, 238-239 (internal citations omitted).

In deciding whether probable cause exists, the court may examine the collective knowledge of law enforcement officers involved in the investigation, as long as they maintained at least a minimal level of communication during their investigation. *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). *Accord United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (collective knowledge of the officers is relevant to probable cause inquiry); *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir. 1984)

(rejecting argument that evidence must be suppressed where agent who stopped and searched car and arrested occupant did not have probable cause, since agent he was working with had knowledge of facts that established probable cause: "where a group of officers is conducting an operation and there is at least minimal communication among them, we look to the collective knowledge of the officers in determining probable cause).

Finally, the determination of probable cause is an objective determination, made without regard to the subjective beliefs of the officers. *Whren v. United States*, 517 U.S. 806, 813 (1996); *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997).

B.     A Stop and Detention Based on Reasonable Suspicion

In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court established that a law enforcement officer who has a reasonable and articulable suspicion that criminal activity is afoot is permitted to conduct a brief investigatory stop even in the absence of probable cause.  It is well-settled that this rule applies to investigative stops of automobiles as well as persons on foot.  *United States v. Sharpe*, 470 U.S. 675, 682-83 (1985).  In *United States v. Arvizu*, 534 U.S. 266 (2002), the United States Supreme Court addressed the parameters surrounding the determination of reasonable suspicion with respect to the decision to make a *Terry*-type investigative stop of a car.  The Court emphasized that the existence of a "particularized and objective basis" to support a car stop must be based upon the totality of the circumstances which "allows officers to draw upon their own experience and specialized training," and that although a "mere hunch" is insufficient, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  534 U.S. at 273-74.  The Court reiterated the longstanding principle that even though each of the acts relied upon to support the

16

existence of reasonable suspicion may be susceptible of innocent interpretation, they may collectively amount to reasonable suspicion based upon the experience of the officer. *Id.*

In evaluating the reasonableness of the stop, not only must the court examine the reasonableness of the stop at its inception, but also whether the continued detention was reasonably related in scope to the circumstances which justified the initial stop; *i.e.* "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Stated another way, the test to determine whether a stop and the continued detention are reasonable within the meaning of the Fourth Amendment "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985).

The stop and detention of an individual, such as defendant Joseph Bellamy, is governed by the same principles that apply to the stop of the car. It is well-settled that "law enforcement officers may briefly detain a person for investigative purposes if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220 (11th Cir. 1993).

During the course of that detention, the police "may take reasonable action, based upon the circumstances, to protect themselves during these encounters, or to maintain the status quo." *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985). The critical inquiry is whether the seizure which the government seeks to justify "was sufficiently limited in scope and duration." *Id.* There is no bright-line rule that

17

determines when an investigative detention has ripened into an arrest.  The Eleventh

Circuit has identified the following factors to consider in determining whether an

investigative detention has become unreasonable and thus prohibited by the Fourth

Amendment in the absence of probable cause:

> [I]n determining whether an investigative detention is
> unreasonable, "common sense and ordinary human experience
> must govern over rigid criteria."  We have identified two
> considerations that circumscribe the limits of a seizure: first, a
> balancing test weighing the government's interest involved
> against the intrusion on the individual; and second,
> consideration of whether the scope of the search is strictly tied
> to and justified by the circumstances which rendered its
> initiation permissible.

*United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989).

In determining the permissible scope and manner of detention, the Eleventh

Circuit has frequently stated that an officer's actions in drawing his gun on the suspect

and handcuffing the suspect does not automatically convert an investigative detention

into an arrest.  For example, in *United States v. Gil*, 204 F.3d 1347, 1350-51 (11th Cir.

2000), the Court held that the scope and duration of investigative detention was

reasonable under the Fourth Amendment where the defendant was placed in back of

police car in handcuffs and detained for 75 minutes while police diligently pursued their

investigation by conducting a search of her residence.  *Accord United States v.*

*Blackman*, 66 F.3d 1572, 1576-77 (11th Cir. 1995); *Hastamorir*, 881 F.2d at 1557;

*Kapperman*, 764 F.2d at 790 n.4.

C.    The Determination of Consent

The issue of whether a defendant has voluntarily consented to a search is a

question of fact to be determined by the totality of the circumstances.  *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Blake*, 888 F.2d 795, 798 (11th Cir.

18

1989).  The government has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given.  *Florida v. Royer*, 460 U.S. 491, 497 (1983); *United States v. Matlock*, 415 U.S. 164 (1974).  In *Blake*, the Eleventh Circuit established the following factors to be used to assess the validity of a consent to search: the custodial status; the presence of coercive police procedures; the extent and level of the person's cooperation with the police; awareness of the right to refuse to consent to the search; intelligence and education, and the belief that no incriminating evidence will be found.  *Blake*, 888 F.2d at 798.  Although knowledge of the right to refuse to consent is a factor to be considered, it is only one factor to be considered under the totality of the circumstances, and the United States Supreme Court has expressly stated that there is no presumption of invalidity if the government fails to establish such knowledge, and that no "extra weight" is to be given "to the absence of this type of warning."  *United States v. Drayton*, 536 U.S. 194, 207 (2002).

In addition, there is no requirement that *Miranda* warnings be given prior to asking for consent to search.  Even where a subject has invoked his right to remain silent, it is still permissible to request a consent to search.  *United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir. 1993).  Moreover, a violation of the *Miranda* requirements does not necessarily render a consent involuntary.  *United States v. Kapperman*, 764 F.2d 786, 793-94 (11th Cir. 1985) (consent found voluntary even assuming a *Miranda* violation).

Numerous cases have examined the voluntariness of a defendant's consent to search.  The Eleventh Circuit has invariably upheld decisions finding that consents to search cars were voluntarily given where the car had been lawfully stopped for a traffic infraction, the encounter was low-key, and there were no coercive police procedures.  *See, e.g. United States v. Simms*, 385 F.3d 1347 (11th Cir. 2004); *United States v. Purcell*,

19

236 F.3d 1274 (11th Cir. 2001); *United States v. Zapata*, 180 F.3d 1237, 1241-42 (11th Cir. 1999) (consent found voluntary where defendant had been detained for short period of time, the consent was express and the environment was not oppressive; and rejecting claim that failure to advise defendant of the right to refuse to consent and defendant's limited comprehension of English prevented defendant from providing voluntary consenting since the record showed defendant had been able to interact intelligently with the police).

The following cases illustrate various scenarios in which consents have been upheld as voluntary, despite the presence of circumstances that are inherently more oppressive than those which inhere in a typical traffic stop: *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002) (consent voluntary despite fact that four agents approached defendant's residence shortly before midnight, and requested admittance to determine whether there were any counterfeit documents located inside the residence, where defendant was specifically advised of his right to refuse consent and signed written consent form, despite defendant's claim that he did not believe he had a choice); *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (defendant's consent was voluntary despite prior protective sweep, fact that defendant was arrested outside his house and brought inside in handcuffs, the presence of 14 armed agents, and the defendant's initial refusal to consent to the search of the entire premises, where the agents advised the defendant of his rights, and did not threaten the defendant, but merely stated that if he did not consent to search of entire house they would secure the premises and attempt to obtain a search warrant); *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983) (consent to search car and suitcase was voluntary where defendant had been stopped at gunpoint, frisked, and placed face down on the road, since officers spoke in

20

conversational tone, had reholstered their weapons, did not threaten defendant, and

defendant was not handcuffed).

On the contrary, in *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir.

1995), the Eleventh Circuit held that a defendant's consent was not voluntary, finding

that the government failed to establish that the consent was "the product of an

essentially free and unconstrained choice."  There, the Court ruled as a matter of law

that the defendant had not consented to the entry into her apartment by police where

she merely opened the door in response to the police request and five armed police

officers quickly entered and conducted a protective sweep of the entire premises; and

that her subsequent consent to a search of the apartment was not voluntary since she

had already witnessed the illegal entry and protective sweep search of the entire

premises.

V.      LEGAL  ANALYSIS AND CONCLUSIONS OF LAW

    A.      The Seizure of the Firearm Was Lawful under the
        Fourth Amendment

        1.      The Officers Had Probable Cause To Arrest
            Defendant For a Weapons Violation

Officer Peart and Detective Azrak had probable cause to arrest Defendant for a

weapons violation.  As stated above, probable cause to arrest exists when the totality of

the facts and circumstances support a reasonable belief that a suspect has committed or

is committing a crime.  In the case at bar, Detectives Saavedra and Mourino saw

Defendant go to his truck, look around as if to ensure he was not being watched, take a

gun from his waistband, and place the gun in a locked tool box in the back of his truck.

Therefore, Detectives Saavedra and Mourino had probable cause to arrest Defendant for

illegally carrying a concealed weapon, in violation of Fla. Stat. § 790.01(2), a third-degree

felony.  A concealed firearm is defined in Fla. Stat. § 790.001(2) as any firearm "carried on or about a person in such a manner as to conceal the firearm from the ordinary sight of another person."  In the seminal case of *Ensor v. State*, 403 So.2d 349, 354 (Fla. 1981)*,* the Florida Supreme Court explained that  the statutory phrase "ordinary sight of another person,"  means "the casual and ordinary observation of another in the normal associations of life." *Id*. at 354. "The critical question turns on whether an individual, standing near a person with a firearm or beside a vehicle in which a person with a firearm is seated, may by ordinary observation know the questioned object to be a firearm." *Id.*  In *Dorelus v. State*, 747 So. 2d 368, 371 (Fla. 1999), the Florida Supreme Court reaffirmed this statutory construction.

In the case at bar, the undersigned credits the testimony of Detectives Saavedra and Mourino that they saw Defendant remove a weapon from his waistband and put it in the toolbox of his pickup truck.  They transmitted these observations by radio to Officer Peart and Detective Azrak.  Therefore, based upon the collective knowledge of all the officers involved in the law enforcement operation, Officer Peart and Detective Azrak also had probable cause to arrest Defendant for a weapons violation based on the information transmitted to them by Detectives Saavedra and Mourino.  *See Acosta*, *supra*.; *Willis, supra.; Esle*, *supra*.[12]

The undersigned rejects Defendant's contention that Detectives Saavedra and Mourino where not truthful in stating that they saw Defendant remove a weapon from his waistband.  In support of his position, Defendant relies specifically upon his written and

_____

[12]  In the alternative, if Defendant was openly carrying the gun in his waistband, Detectives Saavedra and Mourino had probable cause to arrest Defendant for violating Fla. Stat. Sec. 790.053, the statute which prohibits openly carrying a firearm.

oral post-arrest statements, in which he says he had left the weapon inside his truck when he went to Ms. Eve's apartment.  To cast general doubt upon the truthfulness of the testimony of Detectives Saavedra and Mourino, Defendant also relies upon the fact that Detectives Saavedra and Mourino did not make any radio transmissions indicating Defendant had met with the seller, and, upon the testimony of Ms. Eve that Defendant left her apartment and went directly to his truck.

The undersigned credits and accepts the testimony of Detectives Saavedra and Mourino that they saw Defendant take a gun from his waistband.  Not only was their demeanor credible, their testimony was supported by their virtually simultaneous radio transmissions of what they had seen.  Moreover, Defendant's post-arrest written and oral statements also confirm that Defendant had taken his gun and locked it in his truck's tool box.

Concerning the detectives' general credibility, the undersigned also credits the detectives' testimony that they had seen Defendant approach the narcotics seller, give him currency, and then walk away with the seller out of the view of the detectives because they appeared "spooked" by the appearance of marked police vehicles with sirens and flashing lights.  The detectives testified that they had not made a radio transmission of Defendant's arrival in the PSU parking lot and his interaction with the seller because they were initially focused on observing and transmitting the information regarding the driver of the gold Nissan who had purchased drugs; and were then distracted by the appearance of marked police vehicles with sirens and flashing lights. Their testimony is supported by their radio calls around that time, approximately 7:15 and 7:16 pm, in which they discuss the arrival of the marked units.

The undersigned does not find that the testimony of Ms. Eve casts doubt upon the

detectives' testimony.  If viewed in the light most favorable to Defendant, her testimony supports the defense position that the detectives did not see Defendant arrive and that he did not meet with the drug dealer, since she stated that Defendant had been in her apartment for about an hour, after which she saw Defendant leave her apartment and walk straight to his parked truck, get in his truck and leave at approximately the same time that the detectives made their observations.  However, as stated previously, there is reason to doubt Ms. Eve's accurate recollection of events.  Initially, the undersigned finds that her recollection is likely influenced by her bias in favor of Defendant since he is the father of her daughter, pays bi-weekly child support upon which Ms. Eve relies, and Ms. Eve knows that the child support will cease if Defendant goes to jail.  In addition, her testimony regarding the actions of Defendant is inconsistent with his own post-arrest statement since she denied seeing him put "a firearm" or "anything like that" in his toolbox before he drove away.  In addition, her testimony regarding the time he arrived at her apartment and left her apartment was vague.  Ms. Eve did not see or speak to Defendant while he was in her apartment, as she was lying down and resting the entire time.  There was no evidence that Ms. Eve looked at a clock or a watch during the period covered by her testimony.  She assumed that Defendant arrived at her apartment at around 6:00 or 6:15 p.m. because he usually left work at 5:30 p.m. and usually arrived at her apartment at around 6:00 p.m. or 6:15 p.m. to visit her daughter.  She assumed Defendant left her apartment approximately an hour or an hour and fifteen minutes later because that was the length of time he usually stayed.  Even assuming that she truthfully testified that Defendant had visited their daughter that evening, considering the totality of the evidence, the undersigned finds that after Defendant left the area in the manner described by Ms. Eve, he later returned at the time he was observed by the

24

detectives.  Even accepting Ms. Eve's testimony, it is possible that Defendant came to the apartment earlier than 6:00 p.m. on August 19, 2009, and/or that he stayed at the apartment for a shorter period of time than for an hour or an hour and fifteen minutes that day.  Furthermore, it is extremely unlikely that Ms. Eve saw Defendant leave her apartment at 7:15 p.m. walk straight to his truck, and get in, because she did not see Defendant place anything in the tool box. Therefore, the undersigned finds that Ms. Eve's testimony does not cast doubt upon the testimony of the detectives that Defendant met with the narcotics seller and gave the seller currency before returning to his truck, removing a firearm from his waistband, and placing it in the toolbox.

      2.    <u>The Officers Had Probable Cause to Search the Truck</u>

For the same reasons that the officers had probable cause to stop the truck and arrest Defendant for carrying a concealed firearm, they had probable cause to believe that the firearm seen by Detectives Saavedra and Mourino was located within the toolbox.  Therefore, a warrantless search of the automobile was permissible under *Carroll v. United States*, *supra.*, and its progeny.

      3.    <u>The Officers Had Reasonable Suspicion To Investigate Defendant</u>
               <u>For a Weapons and/or a Narcotics Violation</u>

In the alternative, Officer Peart and Detective Azrak had reasonable suspicion to stop Defendant and investigate him for a weapons violation.  Even assuming that the facts which led to the stop of the truck did not rise to the level of probable cause, they established reasonable suspicion that Defendant had committed a weapons and/or narcotics violation.  The detectives saw Defendant approach a person who had been observed selling narcotics to three different persons immediately prior to the approach of Defendant.  They observed Defendant hand cash to the seller, at which time the

transaction was interrupted by the presence of marked police units in the area, traveling with their lights and sirens on.  At that time, Defendant and the seller both disappeared behind one of the apartment buildings.  When the Defendant was next seen, he was walking toward his truck, where he opened the door and created a partial visual shield, looked around and removed a handgun from his waistband.  These circumstances gave rise to a reasonable suspicion that he had completed the narcotics transaction while out of the sight of the detectives and that he had carried a concealed weapon in his waistband for protection during the course of that transaction.  He was in an area that, even by the admission of Ms. Eve, was known for narcotics transactions.   These specific and articulable facts objectively gave rise to reasonable suspicion that he was involved in criminal activity, and justified the stop of his truck for further investigation, as permitted under *Terry, supra.,* and its progeny*.*

### 4. Defendant Spontaneously and Voluntarily Consented to the Search of the Toolbox

The totality of the circumstances in the case at bar leads to the conclusion that Defendant's consent to the search of his car was voluntary.  Once Defendant was stopped, he was ordered out of the pickup truck, and Detective Azrak conducted a permissible pat-down for weapons.  *See Terry, supra.* Officer Peart then checked the toolbox, which was locked.  At that point, Defendant spontaneously volunteered that the toolbox was locked and that he had the keys to the toolbox.  He then gave a ring containing numerous keys to Officer Peart, and pointed out the key that unlocked the tool box.  Defendant later confirmed his consent in his oral statement to Detective Ogden at the police station.  Although he was detained at the time, he had not been placed under arrest or handcuffed.

The procedures used to conduct the stop and order Defendant out of the car were somewhat coercive in nature, but not unduly so.   Although guns were drawn, they were pointed down, albeit in the direction of Defendant.   Once a pat-down search occurred, the guns were holstered.   Defendant was not handcuffed, and was standing in a public area.   Defendant was not a stranger to the criminal justice system, having been previously convicted of a felony.   He was extremely cooperative, from the time of the stop through the later questioning at the police station.   Most significantly, he volunteered the keys to the locked tool box, before any request was made.   During his later statement, he confirmed his earlier consent by stating that he had no problem with the officer searching the toolbox.   There is no evidence in the record regarding the intelligence and education of Defendant, except for the fact that he was able to read the written advice of rights form and provide his own handwritten statement, which is not grammatically correct.   However, it demonstrates that he understands, reads and writes English.   Although Defendant must have known that the firearm would be discovered in the locked toolbox, and that he was not permitted to be in possession of the firearm, since the defendant did not testify, it is unclear whether he believed that he would be arrested where a gun was found locked in the toolbox of the truck to which he did not have ready access.   Therefore, neither this knowledge nor the absence of evidence that he was aware of his right to refuse consent outweighs the voluntariness of his spontaneous offer of the key to open the toolbox.

Thus, the undersigned concludes that the consent to search the toolbox was voluntary.

5.     **The Police Were Permitted to Obtain Defendant's Identity and Conduct a Criminal Records Check**

Once the officers discovered the gun in the toolbox, thus confirming the observations of the surveillance detectives, they were permitted to continue their investigation to determine what charges, if any, should be filed. Thus, they were permitted to obtain his identification and conduct a criminal records check. *See Terry, supra.; United States v. Hensley*, 469 U.S. 221, 229 (1985). When this check revealed that he was a convicted felon, it was appropriate to formally arrest him on that charge rather than the concealed weapons charge.

6.     **Defendant's Statements Were Not Illegally Obtained**

Since the search of the truck which revealed the firearm was not illegal, his subsequent written and oral statements are not tainted, and they should not be suppressed as the fruit of an illegal arrest.

**V. CONCLUSION**

In sum, based upon a consideration of all the evidence and the arguments of counsel,[13] the undersigned concludes that Defendant was lawfully stopped based upon probable cause to arrest him for carrying a concealed weapon; and, there was probable cause to search his truck for that weapon. In the alternative, the stop was valid based on reasonable suspicion that he had carried a concealed weapon and engaged in a narcotics transaction; and, he consented to the search of his truck, which revealed the weapon. At the point, it was reasonable to continue the detention to investigate his identity and conduct a criminal records check, which revealed his prior felony

---

[13] The undersigned has considered each point made by defense counsel, even if not specifically addressed in this Report and Recommendation.

conviction.  Thus, the defendant was properly arrested and charged with this offense. His subsequent statements were not tainted by any prior illegality.

Based upon the above Findings of Fact and Conclusions of Law, it is hereby

**RECOMMENDED** that Defendant's Motion To Suppress Statements and Objects (DE # 23), be **DENIED**.

The parties shall advise the District Court of their intentions to file objections to this Report and Recommendation at the calendar call, and unless otherwise ordered by the District Judge, will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by The Honorable K. Michael Moore, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988).

**DONE AND SUBMITTED** in chambers in Miami, Florida on October 21, 2009.

*Andrea M. Simonton*
—————————————————
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished via CM/ECF to:
The Honorable K. Michael Moore, United States District Judge
All counsel of record